« Return to search results

## Case Information

| | | | |
|---|---|---|---|
| **Case Number:** | CV2025-030294 | **Judge:** | Herrod, Michael |
| **File Date:** | 8/25/2025 | **Location:** | Downtown |
| **Case Type:** | Civil | | |

## Party Information

| Party Name | Relationship | Sex | Attorney |
|---|---|---|---|
| Bahig Saliba | Plaintiff | Male | Pro Per |
| American Airline Inc | Defendant | | Pro Per |

## Case Documents

| Filing Date | Description | Docket Date | Filing Party |
|---|---|---|---|
| 8/25/2025 | COM - Complaint | 8/26/2025 | Plaintiff(1) |
| 8/25/2025 | CSH - Coversheet | 8/26/2025 | Plaintiff(1) |
| 8/25/2025 | CCN - Cert Arbitration - Not Subject | 8/26/2025 | Plaintiff(1) |
| 8/25/2025 | NJT - Not Demand For Jury Trial | 8/26/2025 | Plaintiff(1) |

## Case Calendar

**There are no calendar events on file**

## Judgments

| Date | (F)or / (A)gainst | Amount | Frequency | Type | Status |
|---|---|---|---|---|---|
| **No records found.** | | | | | |

Person Filing: _Bahig Saliba_
Address (if not protected): _10824 E. Santa Fe Trl._
City, State, Zip Code: _Scottsdale AZ 85262_
Telephone: _480-755-7889_
Email Address: _cabahig@gmail.com_
Lawyer's Bar Number: _pro se_

Representing ☒ Self, without a Lawyer or ☐ Attorney for ☐ Plaintiff OR ☐ Defendant

For Clerk's Use Only

ORIGINAL

## SUPERIOR COURT OF ARIZONA
## IN MARICOPA COUNTY

_Bahig Saliba_
Name of Plaintiff

And

_American Airlines, Inc._
Name of Defendant

Case No.: CV 2025-030294

**SUMMONS**

Connect with a qualified lawyer through the Lawyer Referral Service. Simply scan the QR code to complete a referral or call us directly at 602-257-4434. Sponsored by the Maricopa County Bar Association

---

**WARNING: This is an official document from the court that affects your rights. Read this carefully. If you do not understand it, contact a lawyer for help.**

---

FROM THE STATE OF ARIZONA TO: _American Airlines, Inc._
Name of Defendant

1. A lawsuit has been filed against you. A copy of the lawsuit and other court papers are served on you with this *"Summons."*

2. If you do not want a judgment or order taken against you without your input, you must file an *"Answer"* or a *"Response"* in writing with the court, and pay the filing fee. If you do not file an *"Answer"* or *"Response"* the other party may be given the relief requested in his/her Petition or Complaint. To file your *"Answer"* or *"Response"* take, or send, the *"Answer"* or *"Response"* to the:

   - Office of the Clerk of the Superior Court, 201 West Jefferson Street, Phoenix, Arizona 85003-2205 OR

   - Office of the Clerk of the Superior Court, 18380 North 40th Street, Phoenix, Arizona 85032 OR

   - Office of the Clerk of Superior Court, 222 East Javelina Avenue, Mesa, Arizona 85210-6201 OR

   - Office of the Clerk of Superior Court, 14264 West Tierra Buena Lane, Surprise, Arizona, 85374.

   Mail a copy of your *"Response"* or *"Answer"* to the other party at the address listed on the top of this Summons.

---

© Superior Court of Arizona in Maricopa County
ALL RIGHTS RESERVED

Page 1 of 2

CV11f 031820

Case Number: _____

3.  If this *"Summons"* and the other court papers were served on you by a registered process server or the Sheriff, within the State of Arizona, your *"Response"* or *"Answer"* must be filed within TWENTY (20) CALENDAR DAYS from the date you were served, not counting the day you were served. If this *"Summons"* and the other papers were served on you by a registered process server or the Sheriff outside the State of Arizona, your Response must be filed within THIRTY (30) CALENDAR DAYS from the date you were served, not counting the day you were served. Service by a registered process server or the Sheriff is complete when made. Service by Publication is complete thirty (30) days after the date of the first publication.

4.  You can get a copy of the court papers filed in this case from the Petitioner at the address listed at the top of the preceding page, from the Clerk of the Superior Court's Customer Service Center at:

    *   601 West Jackson, Phoenix, Arizona 85003
    *   18380 North 40th Street, Phoenix, Arizona 85032
    *   222 East Javelina Avenue, Mesa, Arizona 85210
    *   14264 West Tierra Buena Lane, Surprise, Arizona 85374.

5.  Requests for reasonable accommodation for persons with disabilities must be made to the division assigned to the case by the party needing accommodation or his/her counsel at least three (3) judicial days in advance of a scheduled proceeding.

6.  Requests for an interpreter for persons with limited English proficiency must be made to the division assigned to the case by the party needing the interpreter and/or translator or his/her counsel at least ten (10) judicial days in advance of a scheduled court proceeding.

7.  Eviction Actions/Forcible Detainers: If you want to request a telephonic hearing, please contact the judge assigned to your case. If you do not know your assigned judge, or have not been assigned a judge, please contact Civil Court Administration at 602-506-1497.

AUG 2 5 2025

SIGNED AND SEALED this date

CLERK OF SUPERIOR COURT

JOSEPH W. MALKA, CLERK

By_____

M. Reyna
Deputy Clerk

© Superior Court of Arizona in Maricopa County
ALL RIGHTS RESERVED

CV11f 031820

COPY

AUG 25 2025

CLERK OF THE SUPERIOR COURT
M. REYNA
FOR CLERKS USE ONLY

Person Filing: Bahig Saliba
Address (if not protected): 10834 E. Santa Fe Trl
City, State, Zip Code: Scottsdale AZ 85262
Telephone: 480-755-7889
Email Address: cabahig@gmail.com
Lawyer's Bar Number: _____

Representing ☒ Self, without a Lawyer  or  ☐ Attorney for  ☐ Plaintiff  OR  ☐ Defendant

# SUPERIOR COURT OF ARIZONA
# IN MARICOPA COUNTY

Bahig Saliba

_____
PLAINTIFF,

vs.

American Airlines, Inc.

_____
DEFENDANT.

CV2025-030294

Case Number: _____

## CERTIFICATE OF COMPULSORY ARBITRATION

**\*Notice to Defendant: If you agree with the Plaintiff's Certificate of Compulsory Arbitration, you DO NOT need to file this form.**

The undersigned certifies that this case is (Please check **ONLY** one option below):

☐ **Subject to Arbitration** – The amount of money in controversy **DOES NOT** exceed $50,000, **AND** no other affirmative relief is sought.

☒ **Not Subject to Arbitration** – The amount of money in controversy **DOES** exceed $50,000, **OR** other affirmative relief is sought.

**\*Defendant – If you DISAGREE with the Plaintiff's Certificate of Compulsory Arbitration, please explain why you disagree below:**

_____
_____
_____

SUBMITTED this 25 day of August, 20 25.

SIGNATURE _____

© Superior Court of Arizona in Maricopa County
ALL RIGHTS RESERVED          Page 1 of 1          CV03f 120319

Person Filing: _Bahig Saliba_
Address (if not protected): _10824 E. Santa Fe Trl._
City, State, Zip Code: _Scottdale AZ 85262_
Telephone: _480-755-7889_
Email Address: _cabahig@gmail.com_
Lawyer's Bar Number: _pro se_

Representing  [X] Self, without a Lawyer or  [ ] Attorney for  [ ] Plaintiff OR  [ ] Defendant

For Clerk's Use Only

# SUPERIOR COURT OF ARIZONA
# IN MARICOPA COUNTY

_Bahig Saliba_
Name of Plaintiff

And

_American Airlines, Inc._
Name of Defendant

Case No.: _CV 2025-030294_

## SUMMONS

```
┌─────────────────────────────────────────────────────────────────┐
│ WARNING: This is an official document from the court that affects │
│ your rights. Read this carefully.                                 │
│ If you do not understand it, contact a lawyer for help.           │
└─────────────────────────────────────────────────────────────────┘
```

**FROM THE STATE OF ARIZONA TO:** _American Airlines, Inc._
Name of Defendant

1. A lawsuit has been filed against you. A copy of the lawsuit and other court papers are served on you with this *"Summons."*

2. If you do not want a judgment or order taken against you without your input, you must file an *"Answer"* or a *"Response"* in writing with the court, and pay the filing fee. If you do not file an *"Answer"* or *"Response"* the other party may be given the relief requested in his/her Petition or Complaint. To file your *"Answer"* or *"Response"* take, or send, the *"Answer"* or *"Response"* to the:

   • Office of the Clerk of the Superior Court, 201 West Jefferson Street, Phoenix, Arizona 85003-2205 OR

   • Office of the Clerk of the Superior Court, 18380 North 40th Street, Phoenix, Arizona 85032 *OR*

   • Office of the Clerk of Superior Court, 222 East Javelina Avenue, Mesa, Arizona 85210-6201 OR

   • Office of the Clerk of Superior Court, 14264 West Tierra Buena Lane, Surprise, Arizona, 85374.

   Mail a copy of your *"Response"* or *"Answer"* to the other party at the address listed on the top of this Summons.

© Superior Court of Arizona in Maricopa County
ALL RIGHTS RESERVED
CV11f 031820

Case Number: _____

3. If this *"Summons"* and the other court papers were served on you by a registered process server or the Sheriff, within the State of Arizona, your *"Response"* or *"Answer"* must be filed within TWENTY (20) CALENDAR DAYS from the date you were served, not counting the day you were served. If this *"Summons"* and the other papers were served on you by a registered process server or the Sheriff outside the State of Arizona, your Response must be filed within THIRTY (30) CALENDAR DAYS from the date you were served, not counting the day you were served. Service by a registered process server or the Sheriff is complete when made. Service by Publication is complete thirty (30) days after the date of the first publication.

4. You can get a copy of the court papers filed in this case from the Petitioner at the address listed at the top of the preceding page, from the Clerk of the Superior Court's Customer Service Center at:

   - **601 West Jackson, Phoenix, Arizona 85003**
   - **18380 North 40th Street, Phoenix, Arizona 85032**
   - **222 East Javelina Avenue, Mesa, Arizona 85210**
   - **14264 West Tierra Buena Lane, Surprise, Arizona 85374.**

5. Requests for reasonable accommodation for persons with disabilities must be made to the division assigned to the case by the party needing accommodation or his/her counsel at least three (3) judicial days in advance of a scheduled proceeding.

6. Requests for an interpreter for persons with limited English proficiency must be made to the division assigned to the case by the party needing the interpreter and/or translator or his/her counsel at least ten (10) judicial days in advance of a scheduled court proceeding.

7. Eviction Actions/Forcible Detainers: If you want to request a telephonic hearing, please contact the judge assigned to your case. If you do not know your assigned judge, or have not been assigned a judge, please contact Civil Court Administration at 602-506-1497.

SIGNED AND SEALED this date

CLERK OF SUPERIOR COURT

AUG 2 5 2025

CLERK OF THE SUPERIOR COURT
M. REYNA
DEPUTY CLERK

By_____

**Deputy Clerk**

© Superior Court of Arizona in Maricopa County
ALL RIGHTS RESERVED

CV11f  031820

COPY

AUG 2 5 2025

CLERK OF THE SUPERIOR COURT
M. REYNA
DEPUTY CLERK

Person Filing: Bahig Saliba
Address (if not protected): 10824 E. Santa Fe Trl
City, State, Zip Code: Scottsdale AZ 85262
Telephone: 480-755-7889
Email Address: cabahig@gmail.com
Lawyer's Bar Number: _____

Representing ☒ Self, without a Lawyer  or  ☐ Attorney for  ☐ Plaintiff  OR  ☐ Defendant

# SUPERIOR COURT OF ARIZONA
# IN MARICOPA COUNTY

Bahig Saliba
Name of Plaintiff

American Airlines, Inc.
Name of Defendant

Case Number: CV 2025-030294

Title: **PLAINTIFF'S DEMAND for JURY TRIAL**

Plaintiff, Bahig Saliba , demands a trial by jury in this case. If this
(Name of Plaintiff)

case is sent to compulsory arbitration, Plaintiff demands a trial by jury if there is an appeal

from that compulsory arbitration.

Dated this August 25, 2025
(Date of signature)

(Signature of Plaintiff or Plaintiff's Attorney)

© Superior Court of Arizona in Maricopa County
ALL RIGHTS RESERVED

CVC11f  050718





AUG 2 5 2025

CLERK OF THE SUPERIOR COURT
M. REYNA
DEPUTY CLERK

Bahig Saliba
10824 East Santa Fe Trail
Scottsdale, AZ 85262
Tel: 480-235-0304
Email: cabahig@gmail.com

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| Bahig Saliba,<br><br>Plaintiff,<br><br>v.<br><br>American Airline Inc.,<br><br>Defendant. | Case No.  CV 2025-030294<br><br>**COMPLAINT AND JURY DEMAND**<br><br>**(DISCOVERY TIER LEVEL 3)** |

Plaintiff, Bahig Saliba, (Saliba), brings this action in *pro se* against the above-named Defendant, alleges as follows:

1.      Jurisdiction and venue are proper in this Court.  The matter in controversy exceeds the arbitration limits of $10,000.00.

2.      Plaintiff is a former American Airlines Inc. Airbus A320 Captain with over 27 years seniority.  Saliba has been a Maricopa County, Arizona resident since November of 1997.

3.      Defendant, American Airlines Inc. (AA), is an Air Carrier headquartered in Dallas Fort Worth, Texas with a major hub of operations and a pilot base in Phoenix Sky Harbor International Airport (PHX), Maricopa County, Arizona.

4.      This Court has personal jurisdiction over the parties and subject matter jurisdiction over this litigation and venue is proper in Maricopa County because events subject to this complaint occurred in Maricopa County and in the airspace of Maricopa County and the State of Arizona.

## GENERAL FACTUAL ALLEGATIONS

5.        Before his wrongful termination on December 11, 2024, Saliba was based in AA's PHX hub of operations and pilot base. Saliba holds the required Federal Aviation Administration (FAA) Airline Transport Pilot (ATP) and medical certification that is subject to strict FAA medical standards and Arizona A.R.S. Title 28-8271. A.R.S. 28-8271 – Federal license; violation – states in:

> *"A. A person who operates aircraft in this state for which a license is required by the*
> *United States or the federal agency shall have the class of license that is required."*

and in

> *"B. It is unlawful for a person to operate aircraft in this state in any manner without a*
> *license required by this section."*

A valid FAA medical certificate is required for a pilot to exercise the privileges of the FAA pilot certificate and operate aircraft in Arizona.

6.        Saliba is a seasoned airline pilot. Prior to December 6, 2021, Saliba had an unblemished and unquestionable ethical work history. Statements made on the record by AA, support that fact. Post December 6, 2021, Saliba did not perform any of his normal duties and only interacted with management personnel, who he disagreed with over AA's interference, in his FAA medical certification standards and health decisions he makes to meet and maintain the required certification, and in the legally required declarations prior to every flight. A declaration made by Saliba is an assumption of liability that AA rejected when offered by Saliba. AA and cannot legally assume such liability. *Emphasis added.*

7.        On December 30, 2021, Saliba disclosed to AA, with supporting documents, the FAA April 19, 2021, Covid-19 Johnson & Johnson (J&J) vaccine pause. The FAA pause was due to blood

clotting and lasted until December 23, 2022[1], (exhibit 2). During 2021, AA mandated that all pilots must be vaccinated for Covid-19 under threat of termination, including through the J&J (exhibit 3). AA advertised the J&J was acceptable during the FAA pause. AA managers, who Saliba disclosed the FAA J&J pause to, had the authority to investigate the alleged credible lapses, but refused. Blood clotting is a serious threat to aviation safety and, without proper treatment, may invalidate a pilot medical certification. Use of FAA unauthorized drugs, such as the J&J during the FAA pause, also invalidates a pilot medical certification. Pilot medical certification is required pursuant to A.R.S. 28-8271 & 28-8272. A.R.S 28-8272 – Federal regulation: licensing and registration; violation – states in:

> "A. Aircraft operating in this state shall conform to design, construction and
> airworthiness standards prescribed by the United States or the appropriate federal
> agency for the navigation of aircraft subject to its jurisdiction."

AA operates aircraft with airworthiness certificates that require a pilot and copilot. Both pilots must comply with A.R.S. 28-8271, including maintaining the FAA medical certification standard. As discussed here, the validity of the FAA medical certificate is subject to myriad conditions including the FAA J&J pause Saliba disclosed to AA.

8.     The crux of the case for AA is twofold, the FAA J&J pause, and FAA pilot medical certification standards and authority – First, AA found itself, as a result of Saliba's disclosure respecting the FAA J&J pause of April 19, 2021, facing credible violations allegations it cannot legally defend against. Only in response to a federal investigation, and in a pivot attempt to distance itself from their policy of demanding mandatory pilot vaccination under threat, including through the J&J during the FAA J&J vaccine pause, did AA produced a document it relied on since mid 2021.

---

[1] Notwithstanding the fact that AA admitted, during an Occupational Safety and Health Administration (OSHA) investigation, to having knowledge of the existence of the FAA J&J pause, AA has not been able to present any evidence to dispute the length of the pause. At the time of Saliba's disclosure, the pause had been open ended.

9.      AA's pivot lends credibility to the premise that AA may not impose, as a policy, any medical treatment(s) or procedure(s) on pilots, including restricting their breathing by covering the nose and mouth, while on duty.  The document AA relied on, specifically the footnote AA referenced in exhibit 4, §B, does not have the force and effect of law and does not bind the public in any way (exhibit 1).  The document does not provide AA with legal liability protection.  Additionally, while the evidence shows that AA had the document well before Saliba disclosed the FAA J&J pause, AA did not produce it for over three years and only under a federal investigation.  There was no reason for AA not to provide said document to Saliba on or in proximity of his December 30, 2021, disclosure.

10.      Second, when Saliba, with no uncertain terms and on the record, (exhibit 8) informed AA that their illegal policy of restricting his breathing while on duty invalidates his FAA medical certification and standards and refused to declare fit-for-duty pursuant to 14 C.F.R. §117.5 and operate aircraft, when subjected to such AA policy, AA issued a retaliatory and threatening "Written Advisory" letter demanding that he follows the directive (exhibit 5), restrict his breathing and perform his normal duties in violation of A.R.S. 28-8280 & 28-8271.  A.R.S. 28-8280 – Careless or reckless aircraft operation; violation; classification; definition. – States in:

> "A. A person who operates an aircraft in the air, on the ground or on the water in a
>
> careless or reckless manner that endangers the life or property of another is guilty of
>
> a class 1 misdemeanor. In determining whether the operation was careless or reckless,
>
> the court shall consider the standards for safe operations of aircraft prescribed by the
>
> federal statutes or regulations governing aeronautics."

Operating aircraft while not meeting the FAA medical standards for the class of certificate issued, is careless, reckless, and endangers the souls on board and on the ground, including crew and property.

11.    In retaliation for his refusal to violate the FAA medical standards, and his FAA J&J pause disclosure, AA pulled all the stops, and when AA had the opportunity, AA attacked Saliba to destroy his career and credibility in an attempt to silence him.  In simple terms, AA decided to destroy Saliba's career rather than address the J&J lapses and follow the rule of law.  No matter what Saliba complied with, the outcome was predetermined by AA.  AA was determined to silence Saliba at any cost and terminate his employment.

12.    AA's unlawful mandates of medical treatment(s) and procedure(s), as a condition for operating AA aircraft in the airspace of Maricopa County and Arizona, interfered in Saliba's FAA pilot medical certification standards and process and illegally impaired his ability to comply with A.R.S. 28-8271, 28-8280, and 28-8272 in the performance of his regular Pilot in Command (PIC) duties.  It was highly imperative for AA that Saliba complies so as not to fracture the pilot group compliance and delegitimatize AA policy[2].  These factual AA concerns were stated on the record on January 6, 2022 (exhibit 9).

13.    Saliba's strict adherence to FAA rules and regulations and to A.R.S. 28-8271 and 28-8280, and his refusal to make any fit-for-duty declarations pursuant to 14 C.F.R. §§61.53 & 117.5 under the pains of 18 U.S.C. §1001, assume liability, and operate aircraft under AA threat of termination and intimidation, or allow any interference through the imposition of any medical treatment(s) or procedures(s), and his disclosure to AA of the FAA J&J pause in expectation of an investigation, came under assault of retaliation by AA up to and including the termination of his employment as detailed in this complaint.  This dispute between the parties is firmly rooted in the Arizona laws and statutes.  For the benefit of the Court, while it may seem lengthy and technical, the discussion follows.

---

[2] AA had no legitimate business reason to violate the pilot FAA medical standards and operate aircraft for profit in Arizona airspace and the United States.

## FAA PILOT MEDICAL SATNDARDS, CERTIFICATION, PROCESS AND
## DECLARATIONS

14.     In *Solondz v. Federal Aviation Administration,* United States Court of Appeals for the

District of Columbia Circuit, No. 24-1105, paragraph A:

> *"Congress has called on the Federal Aviation Administration (FAA) to "promote safe*
> *flight of civil aircraft" by promulgating regulations "necessary for safety in air*
> *commerce." 49 U.S.C. §44701(a)(5).   To that end, the FAA requires a pilot to hold*
> *both an airman certificate (also known as a pilot certificate) and a medical certificate.*
> *14 C.F.R. §§61.3(a), (c), 61.23(a).   The FAA Administrator is authorized to issue*
> *medical certificates, 49 U.S.C. §44703, an authority which has been delegated to the*
> *Federal Air Surgeon. 14 C.F.R. §67.407."*

A <u>valid</u> FAA medical certificate is the single most critical factor in the safe operation of an aircraft.

15.     The bedrock of FAA medical certification is interference-free health decision-making,

informed consent, pilot engagement with the FAA Aeromedical Examiner (AME) for the

determination of any drug use, and <u>declarations,</u> and examination and certification. *Emphasis added.*

16.     AA does not play any role in the process of FAA pilot medical certification or setting

the standard or can legally make any health declaration on behalf of the pilot. AA cannot have a

"partnership" in maintaining the FAA medical standard or legally impose any medical treatment(s) or

procedure(s)[3] or make declarations.   AA has never presented any such authority[4].   The medical

certificate is a legal document with terms and conditions that pilots are subject to must comply with

---

[3] AA has not presented any authority given by the FAA to impose any medical treatment(s) or procedure(s) and AA must use FAA certificated pilots.

[4] As discussed below, AA's position statement submitted in response to an OSHA AIR21 investigation, in which AA distanced itself from its policy of mandating medical treatments for the pilots under threat, underscores the fact that AA is aware it does not have any such authority and of the liabilities of such policies.  (Exhibit 2)

including the declarations made before every flight. A declaration is a major element of the certification process. In other words, certification is not a simple product of a doctor visit.

17. The autonomous, interference-free health decisions pilots make, including the type of meals to consume, medications to use, activity to engage in, such as blood donation or scuba diving for example, and <u>adequate breathing</u>, for the purpose of meeting and maintaining the FAA medical standard is _final_. *Emphasis added.* It is the law.

18. Strict adherence to the mental and physical readiness of a pilot to perform duty is critical. AA interfered in Saliba's FAA medical standard by demanding compliance with unlawful AA created policies that directly and negatively impacted said FAA medical standard and process.

19. A pilot breathes freely during the examination for the FAA medical certification; thus, restricting breathing, which is not regulated by the FAA[5] or allowed for under 14 C.F.R. Part 67, the Standard for FAA pilot medical certification of all Classes, is not legally or factually supported and invalidates the medical standard rendering the pilot illegal to operate aircraft.

20. Operating aircraft in noncompliance with FAA medical certification standards is a serious offense. It is careless and reckless, and subjects crew, passengers, and property to harm. It is in violation of A.R.S. 28-8280, a class 1 misdemeanor, A.R.S. 28-8271 & 28-8272 and the federal regulations. Saliba refused to violate Arizona law and make any required declarations, under threat of termination, when subjected to AA mandated terms and conditions that violate the safety standard.

21. The holder of an FAA medical certificate has the duty to disallow any interference. If breached, the process is neutered and rendered moot and void and any declaration of fitness for flight, also moot and void. Any operation in willful disregard of the health of a pilot is careless, reckless, dangerous, and is in violation of A.R.S. 28-8280, 28-8271 & 28-8272. On January 6, 2022, Saliba

---

[5] The FAA did not provide legal guidance to indicate that restricting breathing in any measure does not invalidate the FAA medical certification.

offered AA control over his medical, provided AA assumes liability by making the required declarations, and AA rejected the offer. Only the pilot can lawfully assume such liability.

22.      AA retaliated, intimidated, threatened, terminated, and harmed Saliba for his refusal to violate the FAA medical standard and process and Arizona law by disallowing any AA interference, no matter how seemingly insignificant, in his duty to meet and maintain said FAA medical standard while performing his duties in Arizona airspace. In simple terms, AA demanded that, following Saliba's clear position that AA's unlawful policy impairs his medical standard, he complies with their demands in a retaliatory "Written Advisory" letter (exhibit 5) on January 11, 2022, that spelled, comply or you are fired. *Emphasis added.*

## PROHIBITION ON INTERFERENCE IN CREWMEMBER DUTIES

23.      14 C.F.R. §§91.11 & 121.580, Prohibition on interference with crewmembers –

*"No person may assault, threaten, intimidate, or interfere with a crewmember in the performance of the crewmember's duties aboard an aircraft being operated"*

A pilot and the pilot medical condition are inseparable. Any interference in the pilot medical condition anytime and anywhere, especially while on duty, impacts the medical standard and safety of flight.

24.      The FAA interprets rule §91.11 to include persons who are not on-board the aircraft. See *Adm'r v. Siegel,* NTSB Order No. EA-3804 (Feb. 10, 1993), 1993 WL 56200. In *Siegel,* one pilot outside the aircraft physically assaulted another inside the helicopter preparing for flight. Rule §91.11 is also the legal interpretation for laser light pointing at aircraft that impairs and may cause permanent damage to the pilot eyesight. This impairs the medical standard and voids the certification and declaration of fitness for flight made by the pilot, and subjects crew and passengers to harm.

25.    Directly interfering with the crewmember duty, or interference in the health or health decision-making process that impacts and impairs the FAA medical certification standard and a pilot's health, under threat of termination, is a serious threat to aviation safety.

26.    Title 18 of the United States Code (U.S.C.) Chapter 2, §39A, for example, makes it a federal crime to aim a laser pointer at an aircraft.  Both, in the *Seigel* case and laser light pointing at aircraft, the violation is the <u>interference</u> in the pilot duties, and in this instant case, just as in laser light pointing, in addition to threat and intimidation, the FAA pilot <u>medical standard</u>. *Emphasis added.*

27.    In effectuating the intent in §§91.11 & 121.580, Saliba rejected any AA interference in the FAA medical standard no matter how inconsequential it may seem.   Saliba is legally obligated to prevent any interference because he, and only he, can make declarations subject to 18 U.S.C. §1001 and assume liability before every flight.   Saliba is subject to harsh penalties if he falsifies his declaration under §1001 or makes declarations on behalf of AA.

28.    For example, 14 C.F.R. §117.25 (e)(f) state in part in (e); *"...The 10-hour rest period must provide the flightcrew member with a minimum of 8 <u>uninterrupted</u> hours of <u>sleep opportunity.</u>"* This means that the air carrier may not interrupt the required rest, and in (f) *"<u>If a flightcrew member</u> <u>determines</u> that a rest period under paragraph (e) of this section will not provide <u>eight uninterrupted</u> hours of sleep opportunity, the <u>flightcrew member must</u> notify the certificate holder"* at which time the 8-hour opportunity must be renewed and the pilot may not report for duty.   The medical certification process and compliance give <u>the pilot the authority and the duty to make those decisions</u>. Again, FAA pilot medical certification is a continuous process; it is not a one-time visit to the AME.

29.    In preparation for flight and to be physically and mentally ready, it is <u>the pilot who</u> <u>makes the health decisions, for it is the pilot who makes the declaration of fitness for flight</u>. Fatigue is another determination made by the pilot. <u>A determination by the pilot, whatever the reason may be,</u>

when not fit to fly is final. AA has no say in how the pilot makes such a determination and must abide by 14 C.F.R. §117.5(b)[6].

30.     While a pilot rest might seem inconsequential, AA lapses detailed in this instant case are of far greater consequence. It is a very serious breach when a carrier or a pilot violate the medical rules in preparation for flight. Saliba's duty when not fit, or when the AA imposed conditions disallow compliance with the FAA medical standards and A.R.S. 28-8271 & 28-8280 such as in this case, is to comply with AA's Administrative §20.5.1[7] and remove himself or not report for duty. Saliba has publicly and to AA, stated his strict compliance with this policy. AA misconstrued statements made to AA in public discourse, statements that are supported by AA's acknowledgment of fitness for duty issues as a result of AA policies (exhibit 9) and used them to fabricate a pretense of abusing AA sick policy and of "defrauding" the company to terminate his employment. AA tailored a legal conflict that Saliba could not comply with and a trap for the ultimate desired result of terminating his employment for disclosing the FAA J&J pause and lapses and refusing to violate the FAA medical standard.

31.     Even if AA had the authority, and AA does not, the fact remains that when Saliba told AA on January 6, 2022, that the policy of restricting his breathing while on duty negatively impacts his FAA medical standard (exhibit 8), and that he will not violate the standard, and that he must report for duty in his full faculties as he sees fit, AA retaliated and inserted the "Written Advisory" letter in his file demanding, under threat of termination, that he complies with AA policy and operate aircraft in Arizona and throughout the United States in violation of A.R.S. 28-8280.

---

[6] 14 C.F.R. §117.3 defines *Fit for Duty* to mean physiologically and mentally prepared and capable of performing assigned duties at the highest degree of safety.
[7] AA Administrative §20.5.1 states: Do not report for duty or start a flight segment with a known medical deficiency that would not meet medical certificate requirements.

32.    AA imposed conditions that legally prohibited Saliba from reporting for duty pursuant to AA's own policy in §20.5.1, A.R.S. Title 28, AA's amended sick policy following an arbitration in 2010, and federal regulations, and then harshly punished him for his compliance with §20.5.1 and accused him of abusing AA's sick policy and "defrauding" AA of sick time.

## EXECUTIVE ORDERS AND AA CREATED POLICIES

33.    With the announcement of the Covid-19 pandemic, and for expedient financial recovery, AA created a mandatory policy of masking for passengers and crewmembers, including for pilots who are performing duty.  At a later time, the White House issued several Executive Orders (EO).  One EO addressed masking, which AA claimed their policy was consistent with[8], and another EO required federal contractors to vaccinate their employees.  AA identified itself as a federal contractor.

34.    The EOs must follow the rule of law and clearly stated, as all EOs do, the following: *"Nothing in this order shall be construed to impair or otherwise affect the authority granted by law to an executive department or agency, or the head thereof and shall be implemented consistent with applicable law."*

35.    The law in this instant case is Arizona title 28 and the FAA pilot medical certification, standard, declaration, and process and FAA authority.  Nothing in the EOs impaired FAA authority respecting the medical certification process of pilots and FAA medical standards.  The FAA did not regulate masking and may not impose any medical treatment(s) or procedure(s)[9] for pilots; thus, all of AA's policies impacting Saliba's FAA medical, including their mandate to vaccinate pilots, are strictly AA creation and are in contravention to the FAA pilot medical certification standards and process.

---

[8] AA required pilots to restrict their breathing on the flight deck while performing duty even when pilots were exempt. Pilots were exempt for safety of flight reasons and restriction free medical certification standards.
[9] With the exception of procedures required for the examination during the certification process.

Complaint                                                11

36.     Following the EO for masking, the Center for Disease Control (CDC) developed masking guidance, and the Transportation Security Administration (TSA) issued Security Directives (SDs) consistent with applicable law as pronounced in the Presidential EO[10].

37.     The TSA SDs, numbered SD1542-21-02 and SD1544-21-02 for airport and aircraft operators respectively, were consistent with the CDC order and were renewed several times until the mask mandate was defeated in a Florida court on April 18, 2022.  The SDs contained an exemption in paragraph F3 that is applicable to Saliba.  §F3 exempted

> *"People for who, wearing a mask would create a risk to workplace health, safety, or job duty as determined by the relevant workplace safety guidelines or <u>federal regulations."</u>*

Saliba was not subject to masking.  Here are the links to the TSA Security Directives and §F3.

https://www.tsa.gov/sites/default/files/sd-1542-21-01.pdf   https://www.tsa.gov/sites/default/files/sd-1544-21-02.pdf

38.     Consistent with 49 U.S.C. §44703 and 49 U.S.C. §114(g)(2) which states:

> *"The authority of the Administrator under this subsection shall not supersede the authority of any other department or agency ...whether or not during a national emergency"*

the TSA SDs contained the F3 exemption noted above.  AA created its <u>own illegal policy</u> for pilots who were performing duty for the air carrier.  AA also created its <u>own illegal policy</u> of mandating medical treatment(s) or procedure(s), including the Covid-19 J&J vaccine.  In contradiction to AA's assertions (exhibit 3), there was never any EO or order, or federal requirement for pilots to restrict

---

[10] State governor orders in Washington state, where AA claimed that Saliba violated the AA policy, provided exemptions for persons in Saliba's capacity as well.

their breathing or accept any Covid-19 vaccine. By its own admission, AA does not have the authority
to supersede the FAA rules and regulations respecting FAA medical certification (exhibit 8).

39.     Under threat of termination, AA conditioned Saliba's right to compensation on, 1)
restricting his breathing while on duty, including while on the flight deck in Arizona airspace, by
covering his nose and mouth, and 2) consent to accepting the Covid Emergency Use Authorization
(EUA) drug for continued employment. Saliba rejected both demands which directly interfered in the
FAA pilot medical certification standards, process, and declarations and impaired safety of flight[11] in
contravention to A.R.S. 28-8280, 28-8272 and 28-8271. For Saliba's refusal and disclosure of the J&J
lapses to AA, AA retaliated and terminated his employment as detailed in this complaint.

## REASONABLE ASSURANCES DOCTRINE.

40.     The doctrine of Reasonable Assurances and the airline structure of information
dissemination and policies are fundamental to air carrier operations and safety of flight. As the PIC
of an aircraft operated by AA, Saliba must receive Assurances that AA has complied with all the rules
and regulations, provided him with an airworthy aircraft for flight dispatch, and a crew that is qualified,
trained, current, and holds valid FAA certification pursuant to A.R.S. 28-8272 & 28-8271.

41.     14 C.F.R. §91.3 – Responsibility and authority of the pilot in command – in

(a) The pilot in command of an aircraft is directly responsible for, and is the final
authority as to, the operation of that aircraft.

Therefore, Saliba had the operational necessity and authority to ascertain that copilots, assigned as
crewmembers on flights under his command, follow the FAA medical certification and A.R.S 28-8271
and that he is able to comply with A.R.S. 28-8272. Information disclosed to AA respecting the FAA

---

[11] While the J&J caused blood clotting, other EUA Covid-19 vaccines side effects, as advertised by the manufacturers,
included myocarditis and pericarditis, a heart condition that is a threat to aviation safety. Even if authorized by the FAA,
it is always the pilot's decision whether to use any drug.

J&J pause required AA to provide the necessary information or investigate. AA refused to investigate or provide the information.

42.    These Assurances, surrounding AA's mandatory policy demands for medical treatment(s) and procedure(s) for pilots, in connection with the FAA pilot medical certification standards and process, and the FAA J&J pause, began to deteriorate and fell apart during 2021.

43.    AA's policy threatened pilots with their health, livelihood and right to compensation pursuant to 49 U.S.C. §42112(b). AA was not truthful and falsely projected authority in public and within AA structure. Former AA president and now CEO, Robert Isom, publicly declared in an interview published October 15, 2021, that:

> "...the company won't bow to the pilots' union request to allow for "alternative" to
>
> the Covid-19 vaccine mandate for employees..."

See link https://www.miamiherald.com/news/business/article255028587.html

44.    The AA VP of Flight, Capt. Chip Long, also in a misleading statement in late 2021, (exhibit 3) directed at pilots under the title "Federal vaccine requirement," an untruthful statement in and of itself, threatened pilots with termination if they did not comply.

45.    AA pilots, including Saliba, relied on information provided by AA as true and accurate; however, AA withheld or omitted critical information contained in the Presidential EOs and the TSA SDs and projected authority it did not have over FAA pilot medical certification standards.

46.    In AA's response to an Occupational Health and Safety Administration (OSHA), 49 U.S.C. §42121 (AIR21) investigation, with respect to the J&J lapses, AA clearly indicated it does not have the authority and, in a pivot, attempted at distancing itself when stated in §B (exhibit 4):

> "The FAA encouraged pilots to get vaccinated...American _allowed_ its pilots to be
>
> vaccinated, including getting vaccinated with the Johnson and Johnson vaccine..."

47.    It is plain to see as evidenced in exhibits 3 & 4 side by side comparison, that AA has taken a diametrically opposing positions.  Even if true that AA just <u>allowed</u> pilots to take the shots, AA made it a policy and any information that may negatively impact the policy and safety of flight must be transmitted to the pilot population.  On information and belief, AA never informed Saliba of the FAA J&J pause, or of its release.  AA admitted in its position statement to OSHA in §B to having knowledge of the J&J pause.  No matter how short the pause was, and it wasn't short, AA did not tell Saliba not to take the J&J shot, on the contrary, AA incentivized and coerced Saliba to take it and advertised it was acceptable in company messaging to all the pilots.  Even when Saliba disclosed the J&J lapses, AA refused to investigate and retaliated against Saliba to silence him.

48.    Saliba has provided AA with what became public knowledge of at least two pilots who took the J&J during the pause.  One died within 17 days following the shot and the other lost his FAA medical certification due to cardiac arrest.  Both attributed to the J&J vaccine by the victims.

49.    There exists a high probability that, out of 14500 AA pilots, many have taken the J&J; thus, in addition to the safety aspect, there is the legal question of the validity of AA pilots' FAA medical certification and liability.  AA has refused to investigate the safety implications of their mandated policy or the legality of its pilots when asked to do so by Saliba.  These safety lapses directly impact operations in Arizona airspace.

50.    The implications of such an investigation may be debilitating for AA, <u>a credible and valid reason and a strong motive to retaliate against Saliba and silence him</u>.  The most effective way to silence a pilot, and it is a common industry practice, is to subject the pilot to a fitness for duty examination, which is subjective by all standards, discredits, and destroys the pilot reputation and FAA medical certification.  AA went on to do exactly that to Saliba and demanded a fitness for duty

Complaint                                          15

examination without providing the legally required reason (exhibit 6).  Also see another airline pilot

story link  https://ssmplaw.com/wp-content/uploads/2021/01/Petitt-Case-Summary-LH.pdf

51.    AA disclosure during the OSHA investigation of their reliance on a Safety Alert for

Operators  (SAFO)  https://wp.iap2750.org/wp-content/uploads/2021/06/SAFO20009.pdf  document

published by the FAA Air Transportation Division on May 25, 2021, which is not legally binding, in

support of AA policy, does not provide a legal position to convince the Court that AA did not have a

motive to retaliate against Saliba.  To the contrary, it supports a motive for retaliation and raises the

question for not providing the document to Saliba upon his December 30, 2021, disclosure.

52.    AA cannot deny liabilities for policies it created that interfered in FAA pilot medical

certification standards and process and declarations pilots make, and the harms inflicted on Saliba for

refusing to comply with unlawful AA policies.  AA pilots, who nevertheless complied under threat of

termination, rejected AA policies and codified their rejection in a provision in the new 2023 Collective

Bargaining Agreement (CBA), denying AA authority to impose any future medical procedure(s).

53.    The provision in the 2023 CBA Section 24.S.1 states:

*"The company may not require a pilot, at any time, to undergo medical procedure(s),*

*other than those required by the FAA to maintain a First-Class Medical Certificate..."*

54.    The Court must consider the following.  With the provision in CBA 2023, Sec. 24.S.1,

the valid and relevant question becomes evident; if it were indeed a federal requirement to vaccinate

pilots as AA contended, and it was not, then Section 24.S.1 must necessarily deny AA the ability to

comply with any future federal requirements and thus federal contracts. That would violate AA's

fiduciary duty and harm AA investors and their business model which may deprive them of millions

of dollars in federal contract revenue.  Simply, the answer is that there was never a federal requirement

to vaccinate pilots, and AA deceived Saliba and intimidated and threatened him with his livelihood into compliance in violation of the spirit of the Reasonable Assurances doctrine.

55.     AA created its own distinct medical standard that contravenes A.R.S. 28-8271 & 28-8272, and in its implantation, violated the Reasonable Assurances doctrine. Saliba warned AA about operating illegally. AA had the motive to retaliate, inserted the threatening and coercive Written Advisory in Saliba's record, demanded performance of duty under threat in violation of A.R.S. title 28 and subjected him to repeated disciplinary actions up until his termination.

56.     The Court can conclude that these facts alone, in conjunction with Saliba's challenge of AA authority to impose any mandatory medical treatment(s) or procedure(s), provide a strong motive for retaliation against Saliba in order for AA to avoid any future potential liabilities. AA weaponized the tools it has, including the CBA grievance process, in order to retaliate against and eventually and unlawfully terminate Saliba's employment by first, demanding the illegal fitness for duty examination, followed by the illegal suspension of pay following a sick notification.

## THE FAA J&J PAUSE.

57.     The Court now knows that AA mandated the vaccination of AA pilots under threat of termination (exhibit 3) and incentivized compliance, that in response to an OSHA investigation pursuant to 49 U.S.C. §42121, AA pivoted in their position statement to the agency and assigned liability to the FAA and the pilots themselves. In short, AA is untruthful and will continue to be untruthful. Only when the AA corporate veil was thinning and AA could not outwardly project authority or legally support its policy respecting the FAA J&J pause, did AA attempt denying they coerced pilots to take the drugs under threat, including the J&J. That attempt fails. This presents a strong motive for retaliation against Saliba because of his J&J disclosure. The Court must see it for

what it is; to protect AA from liabilities, AA retaliated against Saliba by subjecting him to repeated disciplinary actions culminating in terminating his employment.

58.    The FAA J&J pause was for blood clotting, a condition pilots are susceptible to, and it lasted from April 19, 2021, until December 23, 2022 (exhibit 2).

59.    AA has not been able to provide evidence contrary to the pause duration, while at all times, AA advertised on its employee website that the J&J was acceptable for pilot use and paid pilots for taking the Covid vaccines, including the J&J, in accordance with an agreement AA made with AA pilots' union, the Allied Pilots Association (APA), on March 25, 2021 (LOA 21-002).  LOA 21-002 was extended once to expire on November 24, 2021.

60.    Saliba brought serious aviation related compliance, and safety sensitive information, including the FAA J&J vaccine pause that potentially violates A.R.S. 28-8271, 28-8272, and 28-8280 to the attention of multiple AA managers who were able but refused to investigate.  In response, AA retaliated against and terminated his employment as detailed in this complaint.

61.    The critical safety information that Saliba brought forward, respecting the FAA J&J pause, was first brought on December 30, 2021.  AA never gave Saliba any clarification, even when they had the SAFO document AA provided to OSHA, or investigated his concerns, and not until February 25, 2025, that AA assigned liability to the FAA and the pilots themselves in the Position Statement to the OSHA investigator in which AA stated its reliance on a footnote in the SAFO 20009 document dated May 25, 2021, in support of their policy. (Exhibit 4, paragraph B)

62.    AA reliance on the footnote in the SAFO 20009 document, (see link above) which contains information that *"... does not have the force and effect of law and are not meant to bind the public in any way..."* is not legal and indicates that AA had the document it relied on well before Saliba disclosed and asked for the clarification of the FAA J&J pause on December 30, 2021, but AA

refused to provide it or investigate. All the while Saliba was asking, AA withheld the purported supporting document for over 3 years and instead retaliated against him by demanding a fitness for duty examination with no reason given or existing, and denied him compensation following a sick notification on August 18, 2022, to harm and shut him out and eventually terminate his employment on fabricated false pretenses.

63.    By omission, AA hid the fact that the J&J FAA pause lasted almost one and half years all the while AA paid pilots to take the drug. Considering the J&J was a single shot, and many favored the single shot application, there is a high probability that a great number of AA pilots have taken the J&J drug during the pause. A good and strong motive for AA to retaliate and silence Saliba.

64.    The SAFO 20009 document that AA relies on does not provide legal authority for the status of the FAA J&J pause or authorization for its use or its release to the pilots. It only provides, in the footnote AA referenced, general guidance for the use of the drug. AA does not have any legal documents supporting their policy, a good reason not to provide Saliba with the requested information. Liabilities that AA may incur due to their policies and the facts presented in this complaint provide a strong prima facie evidence and a strong motive for AA retaliation against Saliba as detailed here.

65.    No less than 25 AA managers, in addition to AA Board of Directors and CEO, Robert Isom, were notified and asked to investigate the FAA J&J pause, and none responded or investigated. Instead of providing answers, one manager, the Los Angeles and Phoenix Arizona pilot base Director of Flight, Capt. Peter Blandino, in an email to Saliba on December 11, 2023, told Saliba to stop asking about the J&J pause. *See footnote 16 below.*

**EVENTS DIRECTLY RELATED TO AA RETALIATION AND UNLAWFUL**

**TERMINATION OF SALIBA'S EMPLOYMENT**

66.    On November 5, 2021, AA VP of Flight, Capt. Chip Long, in a message directed at pilots under the heading "Federal vaccine requirement," threatened termination if pilots did not comply with company vaccination policy (exhibit 3).

67.    With the breakdown of the Reasonable Assurances doctrine, and on November 23, 2021, Saliba challenged AA's authority to demand pilot vaccination and asked Long to provide the documents supporting AA vaccination policy.  Long replied and said: *"I can't Bahig, but I am adding our People Team for guidance."*  To date, neither Capt. Long nor AA or the "People Team" replied or provided any such documents or authority.    As discussed above, in a strong indication of no authority, AA pivoted in their position statement to OSHA (exhibit 4) and stated that the *"FAA encouraged"* pilots to take the vaccine and AA *"allowed the pilots to get vaccinated."*

68.    On November 26, 2021, American Airlines Captain Wilburn Wolfe (Wil), also an Arizona resident, died within seventeen days of taking the Covid-19 J&J vaccine.  Capt. Kenneth Wood, the PHX Chief pilot arranged for Wil's transfer to his hometown.  AA has knowledge that Wil died following and within seventeen days of taking the J&J, through Capt. Wood and in accordance with LOA 21-002 and AA policy. Wil would have reported his vaccination status and received payment for getting vaccinated. Wil's death went public immediately when his widow announced it on social media.  AA still refused to investigate the J&J lapses when Saliba asked AA to do so.  AA was paying pilots for taking the J&J shots since April 2021.

69.    On December 6, 2021, AA removed Saliba from active service for a purported company policy violation and placed him on administrative leave pending an investigation.  The charge was that Saliba did not restrict his breathing by wearing a mask over the nose and mouth while

performing duty. Even though AA learned about this purported violation prior to a flight for which Saliba was the assigned captain, AA authorized Saliba to operate the flight to Dallas Fort Worth where AA could find his replacement before removing him from active service.

70.    AA ordered the long time PHX Chief pilot Capt. Wood to issue a directive to Saliba and, according to Wood, if Saliba did not comply, then *"...we got him on insubordination..."* Wood was told by his manager, Capt. Long. After Saliba provided Capt. Wood with the rule governing pilot fitness for flight and the exemption in the mask order, Capt. Wood agreed with the language in a text message to Saliba and refused to issue the directive. Capt. Wood was removed from any active role in the process and was replaced with Capt. Raynor who was flown from Chicago to conduct the hearing of January 6, 2022.

71.    On December 13, 2021, Saliba asked Capt. Long to state AA's position respecting a Temporary Restraining Order placed on the vaccination requirement for government contractors in all fifty States. Long refused to answer but asked Saliba if mask compliance is an issue and to ask if Saliba had any questions about getting vaccinated. Saliba asked to be directed to someone who can provide answers. Long never replied with any information or provided a person who could provide any information and no one from the People Team contacted Saliba with any information.

72.    Clearly, Reasonable Assurances were not being given by AA. On December 30, 2021, and until termination of his employment, Saliba first challenged the VP of Flight Capt. Chip Long and disclosed and requested clarification for the FAA J&J pause of April 19, 2021, and thereafter communicated the same concerns with many other AA managers, including the CEO and AA Board of Directors, none of whom replied or provided any answers. None of them conducted any investigation either.

73.    On January 6, 2022, Saliba was subjected to one of many disciplinary hearings, and this one for not restricting his breathing while on duty.  The hearing resulted in the following facts:

– AA policy was intended to bring people on airplanes.

– AA was aware of a fitness for flight issue created by their policy of masking (exhibit 9).

– AA threatened Saliba with termination or suspension of pay.

– Capt. Raynor, who conducted the hearing, said he would not do anything to impair his medical but yet issued the threatening "Written Advisory" demanding that Saliba comply.

– Raynor admitted he was sent to PHX to check a few boxes.  Evidently, AA did not want to listen to Saliba.  AA wanted to threaten him and have a few boxes checked for the record.

– AA treated Saliba disparately by not enforcing masking against other pilots present in the crew lounge during the hearing who were on duty but did not wear a mask all the while Saliba complied with AA policy at the time.

– AA admitted that masking was their policy, and that it had nothing to do with the CDC order.

– Saliba informed AA that he will not comply with AA policies that impair his FAA medical standard.  That masking negatively impacts his FAA medical all the time.

– Saliba offered AA full control of his medical and that he would do anything AA asks if AA can show authority and make all the legal declarations Saliba makes.  AA twice declined the offer.

– AA wanted Saliba to set the tone so others would follow and wear a mask regardless of the effects on his FAA medical certification standards[12].

– AA confirmed the unquestionable, unblemished, and ethical work history of Saliba.

---

[12] Saliba witnessed pilots carrying oximeters to check their blood oxygen level while on duty.

- AA admits to not having authority over Saliba's FAA medical standards and stated that AA will never present him with any evidence AA is superseding the FAA authority and safety standards[13] (exhibit 8).

- Contrary to the 'Written Advisory" language, Saliba never admitted to violating any policy and was in full compliance with all applicable laws.

74.    The record shows that, even when Saliba told AA that <u>restricting his breathing negatively affects his FAA medical standard</u>, AA coerced Saliba under threat to comply with AA policy of restricting breathing while on duty, even when on the flight deck and in Arizona airspace and never provided any alternatives.

75.    On January 11, Raynor called Saliba, and attempted but failed, to verbally get his consent for compliance with AA policy only.  Saliba refused to waive available exemptions for safety reasons.  AA issued the Written Advisory containing the threat anyway and demanded that Saliba perform his normal duties and follow AA policy of restricting breathing while on duty.

76.    On December 6, 2021, Saliba was in full compliance with aviation law, the mask order, local rules, and applicable legal company policies. There was no need for a Written Advisory to be inserted in Saliba's record.  AA's plan to silence, retaliate, and terminate Saliba's employment is supported by the record and AA's actions.

77.    AA used the Written Advisory to subject the dispute over the Public Policy of FAA medical certification standard, not subject to the minor dispute resolution pursuant to the Railway Labor Act (RLA) grievance process outlined in the CBA, to the grievance process.

78.    AA subjected the pilot right to compensation created by a statute, also not subject to the RLA or a provision in the CBA, nor was surrendered or waived, to unauthorized medical

---

[13] AA could not because AA never received any authorization from the FAA Aeromedical for such a policy.

treatment(s) or procedure(s) and to the CBA grievance process for the sole purpose of obfuscating and muddying the waters. A pilot fit for duty declaration falls solely under the authority of the pilot and so does any health decision made for the purpose of meeting and maintaining the FAA medical standard, a requisite for enjoying the right to compensation pursuant to 49 U.S.C. §42112(b).

79.    Saliba was returned immediately to active status after the Written Advisory letter was placed in his employee file[14]. Saliba objected to the Written Advisory threat and demanded its removal before returning to work. AA refused to remove the letter. <u>Saliba had already made statements on the record that restricting his breathing violates his FAA medical standards. Returning to work under the terms of the Written Advisory, requires Saliba to make fraudulent fit-for-duty declarations in violation of 18 U.S.C. §1001 and operate aircraft with hundreds of souls on board</u>. AA knew that but tailored and created a serious legal conflict that Saliba rejected and could not possibly comply with.

80.    AA gave Saliba no choice but to comply with AA policy in §20.5.1 and not report for duty. AA created the conditions where Saliba were to report for duty, he would be instantly violating the FAA medical standards and A.R.S 28-8280. Saliba was very clear in the Sec. 21 when he told AA that he will not violate his FAA medical standard. AA knew there was a fitness for duty issue with their policy but coerced Saliba to violate the FAA medical standards anyway.

81.    One element of the conflict had to be removed. AA was not going to remove the threatening Written Advisory from Saliba's file. Having an obligation towards his passengers, to get them to their destination safely, Saliba acted accordingly and properly by not reporting for duty in accordance with §20.5.1. Saliba objected to the Written Advisory, and in a letter, told AA that he will not operate aircraft until the dispute is resolved.

---

[14] It was unusual that Saliba was returned to duty immediately. AA typically held pilots off duty for months after a Sec. 21 hearing. With the mask order on the verge of cancelation, one can conclude that AA intended on subjecting Saliba to the Written Advisory threat and effect before the chance to do so disappears. AA intended on harming Saliba.

82.    Even when not subject to the process, Saliba attempted to resolve the dispute through the CBA grievance process.  Saliba grieved the Written Advisory on February 10, 2022, and appealed it on March 30, 2022.  AA refused to remove the threatening letter from his file.  Capt. Raynor conducted the grievance and Capt. Long; the VP of Flight, conducted the appeal.

83.    <u>During the appeal, Saliba asked AA VP of Flight Capt. Long to answer the FAA J&J pause question and Long refused</u>.  When asked, by Long, why he was not flying, Saliba offered to discuss the matter but neither Long nor any other AA manager discussed it with Saliba or expressed any concern for Saliba's use of §20.5.1 and the AA sick policy or even asked for a doctor's note. AA left the issue open ended and used it as a false pretense for termination.

84.    For the entire time, Saliba always maintained a valid FAA First-Class medical certificate and even provided AA with two letters, one year apart, from his FAA AME attesting to his fitness for duty, stating that Saliba should be returned to flight status.  AA ignored the letters.

85.    On April 9, 2022, another AA Capt. suffered cardiac arrest 6 minutes after landing in Dallas Fort Worth, DFW airport.  According to his account, it was the result of receiving the J&J vaccine in response to Long's threat of termination (exhibit 3).  AA Capt. Bob Snow publicly discussed the events leading up to April 9, 2022, when he suffered cardiac arrest six minutes after landing in DFW with over 200 souls on board.

86.    The very short video links below are packed with details, from forcing pilots to take the shots under threat of termination to the day AA narrowly escaped a major aviation disaster.  AA compromised the safety of the crew, passengers, and equipment by demanding that all its pilots accept a risky medical treatment under threat of termination, including the J&J.  Capt. Snow details how he continued to operate aircraft even when he was suffering from unexplained medical conditions that

began immediately after the J&J shot. https://rumble.com/v15dd0d-bob-snow-says-he-knows-other-active-pilots-who-are-also-having-cardiac-issu.html?e9s=src_v1_s%2Csrc_v1_s_m

87.    In the short interview link below, beginning at the 2-minute mark, Capt. Bob Snow confirms he received the J&J shot. It is believed that AA, just like any corporation, monitors the public domain for information related to AA, thus it is believed that AA knew about Snow's public statement. https://rumble.com/v15czqb-american-airlines-pilot-bob-snow-says-the-covid-19-vaccine-led-to-his-cardi.html?e9s=src_v1_s%2Csrc_v1_s_m These events took place before AA demanded a fitness for duty examination from Saliba and contemporaneously with his disclosure of the FAA J&J pause.

88.    In other interviews, Capt. Snow states that, even when his hospital stay was at a location two miles away from AA headquarters and the Allied Pilots Association, (APA), neither made the effort to visit him to learn the details or the cause of his cardiac arrest. Furthermore, in the interview linked above, Capt. Snow states that he has been contacted by other active AA pilots who are actually suffering from the shots and continue to fly. Capt. Snow never returned to work and is now on disability.

89.    There is a credible threat to safety. AA cannot deny knowledge of these events and the possible causal link of the J&J and other vaccines AA coerced pilots to take under threat of termination. A good reason to distance itself from the practice in the OSHA position statement and a strong motive to retaliate against Saliba and silence him.

90.    Furthermore, a concerning incentive provision in LOA 21-002, which Saliba also brought forward, awarded pilots an extra vacation day for taking any FDA approved vaccine. Anything pilots take must be FAA approved, and the J&J was not for the duration. Saliba simply

followed company manual and code of business ethics and when he discovered a potential threat, informed the company of the lapses and AA retaliated.

91.    This Court must weigh the high relevance of the facts which support a strong motive to retaliate against, and to silence Saliba, by first demanding an illegal fitness for duty examination on April 22, 2022, of an otherwise healthy pilot, without giving a reason, which is extremely destructive to a pilot career and credibility, and then by withholding pay after a sick call to inflict maximum pain to force a separation from AA, and eventually, when all else failed, terminate his employment under false pretenses that AA orchestrated, all of which in retaliation for his disagreement with AA policies and his refusal to violate the rule of law and for his FAA J&J pause disclosure.

92.    On April 12, 2022, a leaked email landed in Saliba's inbox. The email included management personnel from Human Resources, AA legal, and Capt. Raynor. The discussion was about AA's next move, a fitness for duty examination. Raynor wrote in the email: *"...Until we speak to Dr. Barton on 4/21 I'm not going to respond to ANY of CA Saliba's emails..."*

93.    The wheels for retaliation by using the fitness for duty examination were set in motion. Until this point, other than the exchange with Long on March 30, 2022, where Saliba offered a discussion about his refusal to report for duty, no one from management talked to Saliba or expressed any concerns for his rightful use of AA's §20.5.1. Operating aircraft under the distraction of a threat is not safe or within the standards of FAA medical certification and preparedness. It is careless and reckless and a violation of A.R.S. 28-8280. Saliba simply refused to violate his medical standard and was public and upfront about it.

94.    AA's sick policy was amended following an arbitration award known as the Goldstein 2010 award. AA policy states: There are no changes to the following fundamental rights and responsibilities regarding pilot health and fitness to fly –

– The Company supports the rights of a pilot who is ill or injured to use sick leave to the full extent provided for in the Pilot Collective Bargaining Agreement.

– <u>Pilots remain subject to all applicable FARs relating to their ability to fly.</u>

95.    Further guidance in AA §20.5.1 supports the policy.  Again, AA cannot impose a deficiency that impairs a pilot ability to comply with the federal regulations and A.R.S. 28-8271 & 28-8280 while at the same time denying access to policies expressly meant to comply with under such conditions.

96.    On April 18, 2022, the mask mandate was defeated in a Florida court and AA stopped requiring everyone to wear a mask.  On April 19, 2022, Saliba made himself available for AA.

97.    On April 22, 2022, AA removed Saliba from active duty and issued a Fitness for Duty examination demand without specifying the legally required reasons for the demand.

98.    The clear and simple language in the CBA when AA demands a fitness for duty examination does not require interpretation (exhibit 7). It states the following:

*"The company <u>shall</u> notify the pilot, in writing, specifying the nature and extent of its concerns."*

99.    The letter AA issued did not contain what clearly is required in the CBA (exhibit 6). The letter stated:

*"I am withholding you from service with pay pending an evaluation regarding your fitness for duty."*

Saliba's position, supported by the pilot union attorneys and contractual language, is that he had no obligation to attend any examination until and unless AA provided the reasons, in writing, specifying the nature and extent of AA's concerns. To this day AA has never provided the reason.  Saliba acted

within his contractual rights and did not participate in three different appointments AA made, one of which was during his vacation time.

100.    In addition to the contractual requirement, AA never provided any specific, documented reason for the fitness for duty examination which must be based on reasonable belief and objective evidence that Saliba's ability to perform essential job functions is impaired or poses a direct threat to safety due to a medical condition.  Saliba had a perfect record prior to his removal from service, and up until his termination, he did not perform any of his normal duties.  A disagreement with AA over policies that impact and impair Public Policy that is directly under his control when declaring fit for duty does not meet the standard for examination.

101.    The first appointment for the examination, still without giving the reason, was made on May 6, 2022, with who is believed to be Dr. Barton in Chicago.  The same doctor who was named in the leaked email which AA attempted to recall but failed.  After AA could not recall the email, AA canceled the appointment with Dr. Barton.

102.    At this point, AA still had not expressed any concerns over Saliba's use of the sick policy, or given a reason for the examination, but continued its attack and weaponization of the CBA by making another appointment with a different doctor over 65 days later, and this time for July 8, 2022, with a forensic psychiatrist, Dr. Robert Scott Johnson, in San Francisco.  Still having no obligations without a reason given, Saliba did not attend.  The coercion for consent without a reason is unacceptable.

103.    Saliba, verbally and factually, told AA that he will not give up his contractual right for a reason for the examination to be given; however, AA made yet another appointment for August 12, 2022, with the same forensic psychiatrist in San Francisco, this time during Saliba's vacation time.

104.    AA urgently made a third appointment for August 19, 2022, with the same forensic psychiatrist and still without a reason given or even checking if Saliba is available.  There are roughly 300 verified doctors fitting AA's requirement in the Phoenix metro area, but AA chose doctors in Chicago followed by San Francisco.  Not having any obligations to attend but falling ill on August 18, 2022, Saliba notified AA of his illness in accordance with AA policy.  On August 19, 2022, AA ignored and denied Saliba his right to sick use[15], and placed him on unpaid administrative leave that lasted until his termination.  In a strange and bizarre behavior, AA hounded Saliba with disciplinary actions demanding, when the reason is obvious, why did he not go to San Francisco.  The Withhold from Service letter dated August 19, 2022, stated, without any reference to sick abuse or notification:

> *"I am withholding you from service without pay pending the outcome of an investigation into your alleged failure to follow a directive to participate in a Section 20 evaluation."*

A pilot who calls sick in not available for company business.

105.    On October 4, 2022, and for the first time, AA issued a notice for a hearing which included a "possible sick abuse" charge.  AA provided the pilot union a reference to Saliba sick use during the period for when Saliba informed AA that he will not operate aircraft under their imposed medical procedure of breathing restriction. That was well over six months past April 19, 2022, and well over 9 months after Saliba told AA that he will not restrict his breathing while on duty.  For all the hearings, APA was present to represent Saliba, and Saliba provided his position in documents emailed to AA management.  There was nothing Saliba could say in person that he did not put in writing.

---

[15] AA policy pursuant to the Goldstein award confirms the pilot right to use sick to its full contractual extent.

106.    AA weaponized the collective bargaining agreement in retaliation for Saliba's disagreement with AA's policies respecting the FAA medical certification and his FAA J&J pause disclosure. Also, in a November 2023 hearing in which APA represented Saliba, APA attorney Tricia Kennedy stated on the record that the failure of AA to provide reason for the fitness for duty examination renders the directives moot and void. Also, when a pilot has notified sick, he has no obligation to perform any company business including a fitness for duty examination.

107.    For the entire period, AA weaponized the CBA grievance process and subjected Saliba to no less than 4 different disciplinary hearings, all in an attempt to coerce him to comply with AA demand for a fitness for duty examination without giving a reason and extracting consent and subjecting his FAA medical certification standard, the root noncontractual cause of the dispute, to the whims of AA. AA dragged out any resolution to the dispute and scheduled hearings separated by many months and refused to address any of Saliba's concerns respecting the FAA J&J pause.

108.    Saliba consistently asked the J&J question, but AA shut him out and never responded to his concerns even when all the while, as the court now knows, AA had their answer in the SAFO document. Saliba informed AA many times, supported by the FAA AME letters, that he was ready for his normal duty. AA shut him out of any communication outside of the disciplinary process.

109.    The Court will hear AA claim that Saliba was insubordinate because he refused a fitness for duty examination and abused AA sick policy and "defrauded" the company, and that is why his employment was terminated. Saliba never had the intention, and AA cannot prove Saliba intended on defrauding the airline or planned on abusing any sick policy to enrich himself. Saliba simply had a dispute over Public Policy and safety and rejected AA demands under threat to operate aircraft in violation of the rule of law and A.R.S title 28 and complied with AA's Administrative policies in §20.5.1 and was transparent about what he was doing. AA wants to have it both ways, create a legal

conflict and deny Saliba compliance with AA administrative policy in §20.5.1 and the law. That is simply coercion under threat to operate aircraft unlawfully. Saliba rejected AA's coercive measures on safety grounds.

110.    By AA's admission, Saliba is known for being professional, with no adverse record whatsoever or of any abuses, but AA will tell the court that Saliba, somehow and suddenly decided to enrich himself by defrauding AA of sick time, but AA has no evidence to support any allegations to provide to the Court or Saliba including the reasons for a fitness for duty examination. The facts are, as the Court will find, is that AA retaliated against Saliba for bringing extremely serious concerns to management's attention, so serious that AA felt threatened and decided to retaliate and "get rid of Saliba," silence and fire him instead of investigating serious safety concerns and abide by the law and Saliba's refusal to operate aircraft in violation of A.R.S. 28-8271, 28-8272, and 28-8280 and the FAA medical standards.

111.    Saliba constantly told AA that he would only comply with AA policies that <u>do not interfere</u> with his FAA medical certification and standard while performing duty and that he will not engage in illegal activity. Even when AA acknowledged having no authority over Saliba's FAA medical standard and declarations, and that the AA policy of restricting Saliba's breathing created a conflict for fitness for flight if complied with, AA demanded, in the Written Advisory letter placed in Saliba's file, under threat of termination, that Saliba continue to perform duty as a pilot and comply with said AA policies and demands.    AA intended and willfully demanded that Saliba perform what is legally impossible.

## **IN SUMMARY**

112.    AA imposed, without any FAA authority given or through any other authority, under threat of termination and other adverse actions, a mandatory policy that interfered with and impaired

Saliba's FAA pilot First-Class medical certification, the FAA medical standard, and legal declarations Saliba makes prior to every flight while operating aircraft for AA in Arizona airspace. AA refused to offer Saliba alternatives and coerced him to operate aircraft under threat and denied him access to relief through well-established policies. Saliba refused to make any declarations under the terms imposed by the airline and violate the FAA medical standards, or violate aviation safety and A.R.S. 28-8280, 28-8272, and 28-8271 and publicly announced actions taken to avoid the conflict.

113.    Saliba informed AA managers[16], who have the authority to investigate and prevent potential violations from occurring, of serious aviation safety lapses respecting the Johnson and Johnson Covid-19 vaccine FAA pause of April 19, 2021. AA refused to provide any response, even when AA had response information which AA provided to OSHA in 2025, or investigate the pause and instead, retaliated against him by demanding a fitness for duty examination without giving or having any reason for the examination, placed him on unpaid leave for over two years, and weaponized the CBA to exert maximum financial harm and pressure, delay a resolution of the legal dispute by weaponizing the CBA and manipulate an outcome. AA used false pretenses to terminate Saliba's employment.

## CLAIM ONE
### (WRONGFUL TERMINATION UNDER A.R.S. 23-1501)

114.    By reference hereto, Plaintiff incorporates all references to all the above allegations in 1 though 113 as if fully set forth herein.

---

[16] These are some of the AA managers who were informed of the FAA J&J pause who refused to investigate: Chip Long, Michelle Montgomery, Vannesa Houston, Maranda Rosenthal, Robern Isom, Doug Parker, Timothy Raynor, Alison Devereux-Naumann, Tania Rocco, Peter Blandino, Russel Moore, Michael Johnson, William Sherrod, AA BOD, Jeff Price, Priya Aiyar, Guia Lucertia, Doug Cotton, Marilyn Flores, Skylah Hicks, Jackie Rios. Included but not listed here were all the pilot base chief pilots and directors of flight.

Complaint                                    33

115.    A.R.S. § 23-1501(3) and A.R.S. §1501(3)(c)(i) provide that an employee has a claim for wrongful termination if the following occurs:

The employer has terminated the employment relationship of an employee in retaliation for any of the following.

(i) The refusal by the employee to commit an act or omission that would violate the Constitution of Arizona or the statutes of this state

116.    On January 6, 2022, and throughout the period in question, and again on December 09, 2024, Plaintiff disclosed in a positive and clear manner that the Defendant's policy of restricting his breathing while on duty, negatively impacts and invalidates his FAA medical certification standard and his ability to make fit for duty declarations and safely operate AA aircraft based in PHX.

117    As a direct and proximate result of the Defendants coercive measures and the threatening Written Advisory letter issued to Plaintiff to perform duty in violations of the statute, Plaintiff responded by clearly stating his obligation to strictly comply with all the FAA rules and regulations governing the pilot medical certification standards and thus Arizona Statute 28-8280 & 28-8271 and refused to operate AA aircraft.

118.    As a direct and proximate result of Defendant's own action with indifference to the rule of law, Defendant terminated the employment relationship with Plaintiff.

119.    As a direct and proximate result of the termination of his employment, Plaintiff suffered loss of wages and benefits, future loss of wages and benefits, mental and emotional distress, damage to his reputation, a total destruction of an illustrious airline pilot career, and loss of enjoyment of life.

120.    As a direct result of Defendant's reckless indifference to Plaintiff's rights and with an evil heart and evil mind, Plaintiff is entitled to recover punitive and exemplary damages in an amount to be proven at trial.

## CLAIM TWO
## (WRONGFUL TERMINATION UNDER A.R.S. 23-1501)

121.    By reference hereto, Plaintiff incorporates all references to all the above allegations in 1 though 120 as if fully set forth herein.

122.    A.R.S. § 23-1501(3) and A.R.S. §1501(3)(c)(ii) provide that an employee has a claim for wrongful termination if the following occurs:

> The employer has terminated the employment relationship of an employee in retaliation for any of the following.
>
> (ii) The disclosure by the employee in a reasonable manner that the employee has information or a reasonable belief that the employer, or an employee of the employer, has violated, is violating or will violate the Constitution of Arizona or the statutes of this state to either the employer or a representative of the employer who the employee reasonably believes is in a managerial or supervisory position and has the authority to investigate the information provided by the employee and to take action to prevent further violations of the Constitution of Arizona or statutes of this state or an employee of a public body or political subdivision of this state or an agency of a public body or political subdivision.

123.    On December 30, 2021, and throughout the period in question, and again on December 09, 2024, the Plaintiff disclosed in a positive and clear manner to the Defendant, what he reasonably believed, was that on April 19, 2021, the FAA followed the recommended pause of the Covid-19 Johnson and Johson vaccine for pilot use.  That there was no indication that the pause was lifted prior to December 23, 2022.  That the Defendant coerced, financially incentivized, or allowed pilots to accept the medical treatment during the pause under threat thereby invalidating the FAA medical

certification; thus, violating Arizona statute title 28-8272, 28-8280, & 28-8201. That the Defendant should investigate lapses in Defendant's policy and alleged violations but refused.

124.    As a direct and proximate result of Defendant's actions, and the Plaintiff's disclosure, on December 30, 2021, through December 09, 2024, of potential unlawful operations in Arizona airspace, Defendant retaliated and terminated Plaintiff's employment.

125.    As a direct and proximate result of the termination of his employment, Plaintiff suffered loss of wages and benefits, future loss of wages and benefits, mental and emotional distress, damage to his reputation, a total destruction of an illustrious airline pilot career, and loss of enjoyment of life.

126.    As a direct result of Defendant's reckless indifference to Plaintiff's rights and with an evil heart and evil mind, Plaintiff is entitled to recover punitive and exemplary damages in an amount to be proven at trial.

## CLAIM THREE
### (VIOLATION OF A.R.S. 28-8208)

127.    By reference hereto, Plaintiff incorporates all references to all the above allegations in 1 though 126 as if fully set forth herein.

128.    A.R.S. § 28-8208 provides for Crimes, torts and other wrongs: governing law

A. Any crime, tort or other wrong that is committed by or against an aeronaut or passenger while in flight over this state is governed by the law of this state.

129.    In late 2019 early 2020, continuing throughout the period in question, Defendant subjected and conditioned, under threat of termination, Plaintiff's right to compensation pursuant to 49 U.S.C. §42112(b) while operating aircraft in and out of Defendant's hub of operations of Phoenix, Arizona and the airspace above Arizona to medical treatment(s) and procedure(s) that interfered in and violated his FAA pilot medical standards and ability to comply with A.R.S 28-8280, 28-8271, & 28-8272 and to enjoy his right.

130.    §42112 (b), provides for Duties of Air Carriers – An air carrier shall

(1) maintain rates of compensation, maximum hours, and other working conditions and relations for its pilots and copilots who are providing interstate transportation in the 48 contiguous States and the District of Columbia to conform with decision number 83, May 10, 1934, National Labor Board, notwithstanding any limitation in that decision on the period of its effectiveness.

And in

§42112(a)(2)(B) qualified to serve as and has in effect an airman certificate authorizing the employee to serve as, a pilot.

131.    As a direct and proximate result of Defendant's policy of conditioning Plaintiff's right to compensation on unlawful policies, Defendant prevented Plaintiff from enjoying his right and terminated his employment.

132.    As a direct and proximate result of the termination of his employment, Plaintiff suffered loss of wages and benefits, future loss of wages and benefits, mental and emotional distress, damage to his reputation, a total destruction of an illustrious airline pilot career, and loss of enjoyment of life.

133.    As a direct result of Defendant's reckless indifference to Plaintiff's rights and with an evil heart and evil mind, Plaintiff is entitled to recover punitive and exemplary damages in an amount to be proven at trial.

**WHEREFORE,** Plaintiff demands Judgment against Defendant American Airlines Inc. as follows:

1.    For Plaintiff unpaid compensation and/or equitable compensation and benefits in an amount to be proven at trial;

2.     For Plaintiff reinstatement to his prior to December 6, 2021, position including placing him on the pilot seniority list with adjustments reflecting no interruption in progression;

3.     For Plaintiff employee record to be expunged of any wrongdoing;

4.     For Punitive and exemplary damages to be proven at trial;

5.     For Defendant to notify all American Airlines pilots of their wrongdoing and facts proven in Court that may impact their FAA medical certification;

6.     For attorney's fees, if and when retained, and costs incurred pursuant to the provisions of A.R.S. §25-324;

7.     For pain and suffering and any other relief the Court deems just and proper.


DATED this ___25___ day of August 2025.




Bahig Saliba
In Pro Se

Saliba v. American Airlines, Inc.

# EXHIBIT

1



# SAFO

Safety Alert for Operators

**U.S. Department
of Transportation
Federal Aviation
Administration**

SAFO 20009
DATE: 05/25/21

Flight Standards Service
Washington, DC

**http://www.faa.gov/other_visit/aviation_industry/airline_operators/airline_safety/safo**

*A SAFO contains important safety information and may include recommended action. Besides the specific action recommended in a SAFO, an alternative action may be as effective in addressing the safety issue named in the SAFO. The contents of this document do not have the force and effect of law and are not meant to bind the public in any way. This document is intended only to provide clarity to the public regarding existing requirements under the law or agency policies.*

**Subject:** COVID-19: Updated Interim Occupational Health and Safety Guidance for Air Carriers and Crews.

**Purpose:** This SAFO updates SAFO 20009 and provides updated interim occupational health and safety guidance by the Centers for Disease Control and Prevention (CDC) and the Federal Aviation Administration (FAA) for air carriers and crewmembers regarding Coronavirus Disease 2019 (COVID-19). The CDC and FAA are providing this additional occupational health and safety guidance for air carriers and their crews to reduce crewmembers' risk of exposure to COVID-19, decrease the risk of transmission of COVID-19 on board aircraft and to destination communities through air travel, and provide guidance for fully vaccinated[1] crewmembers.

**Background:** SARS-CoV-2, the virus that causes COVID-19, has spread throughout the world and to all States and territories of the United States (U.S.). Air carriers and crews conducting flight operations having a nexus to the United States, including both U.S. and foreign air carriers, should follow CDC's occupational health and safety guidance, as outlined in the Appendix below.

**Discussion:** On January 30, 2020, the World Health Organization (WHO) declared that the outbreak of COVID-19 constituted a Public Health Emergency of International Concern. On January 31, 2020, the Secretary of Health and Human Services declared COVID-19 to be a public health emergency in the United States under section 319 of the Public Health Service Act.[2] On March 11, 2020, WHO characterized the outbreak of COVID-19 as a pandemic. On March 13, 2020, the President declared a national emergency concerning the COVID-19 outbreak.

---

[1] People are considered fully vaccinated for COVID-19 two weeks after they have received the second dose in a 2-dose series, or two weeks after they have received a single-dose vaccine. CDC's guidance applies to COVID-19 vaccines currently authorized for emergency use by the FDA: Pfizer-BioNTech, Moderna, and Johnson and Johnson (J&J)/Janssen COVID-19 vaccines. CDC's guidance can also be applied to COVID-19 vaccines that have been authorized for emergency use by WHO (e.g. AstraZeneca/Oxford).

[2] This public health emergency has been renewed several times since January 31, 2020, most recently on April 15, 2021.

Saliba v. American Airlines, Inc.

# EXHIBIT

## 2

🇺🇸 An official website of the United States government Here's how you know ⌄

United States Department of Transportation

 **Federal Aviation Administration**

Home / Newsroom

**Newsroom**

Press Releases

Statements                    >

Fact Sheets

Speeches                      >

Testimony                     >

Conferences & Events          >

Daily Air Traffic Report

Flight Delay Information

FAA Safety Briefing
Magazine                      >

Subscribe to FAA News

# Novel Coronavirus (COVID-19) Update

Friday, July 9, 2021

## 7/9/2021

## FAA Amends Cargo Exemptions

The FAA amended an exemption authorizing airlines to transport cargo that is secured to the seat tracks (PDF) of a passenger aircraft when seats are removed and no passengers are in the cabin. This amendment extends the exemption through December 31, 2021.

The FAA also amended an exemption that allows airlines to secure cargo to passenger seats (PDF) when no passengers are in the cabin. The amendment extends the exemption through December 31, 2021.

#### 4/19/2021

#### Johnson and Johnson Vaccine Update

The Office of Aerospace Medicine is closely following the FDA and CDC Johnson and Johnson Vaccine pause recommendation.  Once the outcome of the CDC ACIP deliberations are known, policy for use by airmen and air traffic controllers will be amended if it is indicated. If you are offered a J&J vaccine outside of the U.S. during the pause, **the 48-hour "No Fly/No Safety-Related Duty" interval must still be observed after the injection.**

#### 2/27/2021

#### Use of COVID-19 Johnson & Johnson Vaccine by Pilots and Air Traffic Controllers

Pilots and Air Traffic Controllers May Receive Johnson & Johnson's Vaccine, With Appropriate Precautions | Federal Aviation Administration    8/16/25, 2:09 PM

🇺🇸 An official website of the United States government Here's how you know ⌄

United States Department of Transportation



# Federal Aviation Administration

Home  /  Newsroom

Newsroom

Press Releases

Statements            >

Fact Sheets

Speeches              >

Testimony             >

Conferences & Events  >

Daily Air Traffic Report

Flight Delay Information

FAA Safety Briefing    >
Magazine

Subscribe to FAA News

# Pilots and Air Traffic Controllers May Receive Johnson & Johnson's Vaccine, With Appropriate Precautions

Friday, December 23, 2022

**WASHINGTON** — Following the Emergency Use Authorization from the U.S. Food and Drug Administration (FDA) for Johnson & Johnson's Janssen COVID-19 vaccine, the Federal Aviation Administration (FAA) has determined that pilots and others who perform safety sensitive duties <u>may receive the vaccine</u> under the conditions of their FAA-issued airman medical certification. FAA and contract air traffic controllers, who are subject to FAA medical clearance, may also receive the vaccine.

To maintain the highest level of safety in the National Airspace System, the FAA will require the affected recipients of this single-dose vaccine to wait 48 hours before conducting safety sensitive aviation duties, such as flying or controlling air traffic. The waiting period, which accounts for potential side effects, applies to those holding an Airman Medical Certificate issued under 14 CFR Part 67 or a Medical Clearance issued under FAA Order 3930.3C.

The FAA's medical professionals will continuously monitor the initial distribution of the Johnson & Johnson COVID-19 vaccine and will adjust the recommendations as needed.

The FAA will evaluate additional vaccines as they receive FDA emergency use authorization and will advise pilots and air traffic controllers of any required waiting periods. The agency previously cleared the FDA-approved Moderna and Pfizer vaccines for aviation use, subject to the same 48-hour waiting period.

The FAA applies similar brief waiting periods after administration of other vaccines, including those for tuberculosis and typhoid.

For more information, please <u>visit the Medical Certification page</u> on our website.

Aviation News

# Paused' J&J Vaccine Now FAA-Approved For Aviation Professionals

 **Mark Phelps** · Tuesday, January 03, 2023



**Audio Coming Soon**                    Advertisement



✦   **Key Takeaways:**                                      ⌄

The FAA announced last week that Johnson & Johnson's single-dose COVID-19 vaccine is safe for "pilots and other safety-sensitive professionals" [such as air traffic controllers]. The vaccine was shelved from distribution to the general public in 2021 after reports surfaced of rare but adverse side effects, such as blood clots in women.

With last week's announcement, aviation personnel may now receive the vaccine "under the conditions of their FAA-issued airman medical certification," the agency announced.

As it does with the multi-dose Pfizer and Moderna vaccines, the FAA requires a 48-hour waiting period between an aviation professional receiving the J&J vaccine and performing duties associated with their roles related to flight. Meanwhile, the agency will also "evaluate additional vaccines as they receive FDA emergency-use authorization and will advise pilots and air traffic controllers of any required waiting periods."

**SHARE THIS STORY** ↗



**Mark Phelps**

Mark Phelps is a senior editor at AVweb. He is an instrument rated private pilot and former owner of a Grumman American AA1B and a V-tail Bonanza.

Saliba v. American Airlines, Inc.

# EXHIBIT

## 3



## News

### Special Jetwire – Federal vaccine requirement

A Special Jetwire was released Oct. 6. The central message was:

**"As a result, all U.S.-based team members must submit proof of full vaccination as soon as possible – no later than Wednesday, Nov. 24, 2021. If you have not submitted proof of vaccination by Nov. 24, we will be in touch to begin the next steps. To be clear, if you fail to comply with the requirement, the result will be termination from the company..."**

While the details are still being worked through, a reminder that LOA 21-002 –Global COVID Pilot Vaccinations/Testing/Protections is effective through Nov. 1. Please plan accordingly.

Chip Long
VP Flight Operations

### Other Articles

- Annual Enrollment for 2022 benefits starts Oct 14 [10/07/2021]
- A letter from David Seymour: September to remember [10/06/2021]
- Special Jetwire – Federal vaccine requirement [10/06/2021]
- A message from Doug and Robert: Vaccine requirement for all U.S.-based team members [10/02/2021]
- Captain James Crawford selected as the new A320 Sr. Manager Flight Training [10/01/2021]
- September 2021 Retirees [10/01/2021]
- 4th Quarter 2021 Recurrent Distance Learning now available [10/01/2021]
- REGISTER TODAY: Crew News - Oct. 19 - Flight Academy/Skyview 3 1G144 [09/28/2021]
- Captain Theodore (Ted) M. Rogachuk – New B737 Fleet Captain [09/27/2021]
- Pilots Awarded Short-Call Reserve's October 2021 [09/19/2021]
- CA Jeff Moore, CIJ Director of Flight, returning to the line [09/17/2021]
- Crew News 9.15.21 [09/17/2021]

Saliba v. American Airlines, Inc.

EXHIBIT

4



For the first time in 2024 (and only after all of these other claims failed), Captain Saliba claimed that American retaliated against him for stating concerns about the Johnson & Johnson vaccination in 2021.[6] This new claim is demonstrably belied by Captain Saliba's litigation history. He has repeatedly asserted other theories for why American withheld him from service and ordered his fitness for duty examination. All of those claims failed, and this one does too.

## FACTUAL BACKGROUND

### A. American Airlines, Its Pilots, And The Allied Pilots Association

American is a global commercial airline headquartered in Fort Worth, Texas. The Company employs approximately 19,000 pilots. The Allied Pilots Association ("APA") represents these pilots.

### B. The FAA Approves The Johnson & Johnson COVID-19 Vaccination For Pilots

The FAA encouraged pilots to get a COVID-19 vaccination, including the Johnson & Johnson vaccination. *See* Exhibit X, SAFO 20009 Revision 1f at Appendix page 1 and n.6. The FAA's only restriction on pilots getting vaccinated was that they must not fly for 48-hours after their dose. (*See id.; see also* FAQs on Use of COVID-19 Vaccines by Pilots and Air Traffic Controls, available <u>here</u>.) Pursuant to this FAA guidance, American allowed its pilots to be vaccinated, including getting vaccinated with the Johnson & Johnson vaccine, and prohibited its pilots from flying for 48 hours after receiving the vaccine. This FAA guidance remains in effect today, although the post-dose flying restriction is only 24 hours. *See* Exhibit Y, FAA Aviation Medical Examiner Guide on Vaccines).

### C. American Terminated Captain Saliba's Employment For Insubordination And Sick Leave Abuse

After an incident with Spokane Airport Police in which Captain Saliba refused to wear a federally-required face mask at the airport in December 2021, American withheld Captain Saliba from service (with pay) in May 2022 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ The Company consequently ordered him to attend a fitness for duty examination under Section 20 of the Joint Collective Bargaining Agreement between American and APA ("JCBA"). *See* Exhibit Z, JCBA Excerpt. Captain Saliba refused to attend the examination, and American then withheld him from service without pay for his refusal in August 2022. *See* Exhibit AA, Notice of Withhold from Service Without Pay. Captain Saliba admitted in federal court documents that he abused sick leave to avoid following American's masking policies. After three years and at least four attempts to allow Captain Saliba to attend the fitness for duty examination and to explain his actions in an investigatory hearing, American terminated Captain Saliba's employment on December 11, 2024 for insubordination and abuse of sick leave – neither of which are related to any stated concerns he had regarding vaccines. *See* Exhibit BB, Termination Notice.

---

[6] He also filed a second amended grievance in 2025 alleging that American took action against him because of his stated concerns associated with the Johnson & Johnson vaccine. *See* Exhibit W at page 3. This allegation was notably missing from his prior grievance. *See* Exhibit F.

Saliba v. American Airlines, Inc.

# EXHIBIT

5

Exhibit 22-6

**American Airlines**

January 11, 2022

Captain Bahig Saliba #475123
PO Box 1926
Cave Creek, AZ 85327

<u>Written Advisory</u>

Dear Captain Saliba,

On January 6, 2022, I held a Section 21 hearing to discuss a report I received indicating that while in the Spokane, Washington airport operating a trip on December 6, 2021, you were not in compliance with the Company's policy requiring employees to wear facial masks.

During the hearing, we discussed the policy requiring pilots to wear facial masks. You acknowledged you were aware of the policy and admitted that you had not complied with the policy.

Further, during the hearing, you were given a verbal and written directive to comply with the Company mask policy and applicable federal mask mandates. You committed to complying with the policy and federal mask mandates applicable to you. You understood that failure to follow the directive would be considered insubordination and could lead to further discipline, up to and including termination of employment.

I am issuing you this Written Advisory, which will serve as notice that you must conduct yourself in a professional manner and comply with Company policies and procedures. Further conduct of a similar nature will not be tolerated and will result in further discipline up to and including termination of your employment. Please note this Advisory will remain in your file for a period of two years and this action will be documented in a PEH which will become a permanent part of your personnel file.

Please take this Written Advisory very seriously. If there is anything I can do to assist in your efforts to meet the Company's expectations as described in this letter, please let me know.

Sincerely,

Tim Raynor
Captain Tim Raynor
Director of Flight, ORD/PHX

CC:  APA

Saliba v. American Airlines, Inc.

# EXHIBIT

# 6

Exhibit 53-2

**American Airlines**

April 22, 2022

Captain Bahig Saliba
PO Box 1926
Cave Creek, AZ  85327
(480) 755-7889

                    Re:     Withhold from Service

Dear Captain Saliba,

I am withholding you from service with pay pending an evaluation regarding your fitness for duty.

While on withhold status, you must remain contactable at the phone number of record listed above. Also, while on withhold status, you are not permitted to use the flight privileges that are provided to you as an American Airlines employee.

Sincerely,

Captain Tim Raynor
Director of Flight, ORD/PHX


cc:     APA

Saliba v. American Airlines, Inc.

# EXHIBIT

# 7

# SECTION 20

## PHYSICAL EXAMINATIONS

**A.** The purpose and object of any Company physical examination for a pilot shall be to diagnose the true and actual physical condition of the pilot, and the pilot or his duly designated personal physician will be furnished with an exact duplicate copy of all medical examiner's reports affecting him.

**B.** Physical standards for Company physical examinations will be those standards set forth in the FAA Regulations as being required to maintain a First Class FAA Medical Certificate with Statements of Demonstrated Ability (waiver) for Air Line Pilots. Physical examination procedures shall be determined by the Company.

**C.** Any information obtained by, or a result of, a Company physical examination shall be strictly confidential between the Company, the Company's doctor, and the pilot, and shall not be divulged to any other person without the written permission of the pilot.

**D.** A pilot shall not be required to submit to any Company physical examination in excess of two (2) in any twelve (12) month period without the pilot's consent, unless it is the Company's opinion that his health or physical condition is appreciably impaired, in which case the following procedure shall apply:

    1. The Company shall notify the pilot, in writing, specifying the nature and extent of its concern.

    2. Any pilot hereunder who, in the Company's opinion, fails to pass a Company physical examination, may, within thirty (30) days, at his option, have a review of his case in the following manner:

        a. He may employ a qualified medical examiner of his own choosing and at his own expense for the purpose of conducting a physical examination for the same purpose as the physical examination made by the medical examiner employed by the Company.

        b. A copy of the findings of the medical examiner chosen by the employee shall be furnished to the Company, and in the event that such findings verify the findings of the medical examiner employed by the Company, no further medical review of the case shall be afforded.

        c. In the event that the findings of the medical examiner chosen by the employee shall disagree with the findings of the medical examiner employed by the Company, the Company will, at the written request of the employee, ask that the two (2) medical examiners agree upon and appoint a third qualified and disinterested medical examiner, preferably a specialist, for the purpose of making a further physical examination of the employee.

        d. The said disinterested medical examiner shall then make a further examination of the pilot in question and the case shall be settled on the basis of his findings. The said disinterested medical examiner will be given a copy of the findings of the two (2) physicians previously mentioned prior to making his examination.

        e. The expense of employing the disinterested medical examiner shall be borne one-half (1/2) by the pilot and one-half (1/2) by the Company. Exact duplicate copies of such medical examiner's report shall be furnished to the Company and to the pilot.

**E.** When a pilot is removed from flying status by the Company as a result of his failure to pass the Company's medical examination and appeals such action under the provisions of this Section, he shall, if such action is proven to be unwarranted, as provided in paragraph D. of this Section, be paid retroactively for all time lost in an amount which he would have ordinarily earned had he been continued on flight status during such period; providing further that in no case shall he be paid for a period in excess of ninety (90) days from the date of his removal from flight status.

Saliba v. American Airlines, Inc.

# EXHIBIT

8

CAPTAIN BAHIG SALIBA     01/06/2022          29

1    no, and again not a threat.  We can, we can either end

2    right now or we can, or we can press on with this.  Are

3    you going to comply with company, company policy, not CDC,

4    but company policy and our Flight Operations Manual, which

5    is what all pilots for American Airlines follow, are you

6    going to comply with -- are you going to comply with what

7    our Flight Operations Manual and company policy say, yes

8    or no?

9        A.    I have already put it in the email.  My duty is

10   to my passengers.

11       Q.    Yes or no.

12       A.    So what I am doing --

13       Q.    Yes or no.

14       A.    What I am doing is protecting my medical and

15   protecting my passengers.  I have the duty towards my

16   passengers, not American Airlines.

17       Q.    And your passengers asked you to wear the mask,

18   too.

19       A.    That's their business, but I am -- my duty is to

20   take them from point A to point B safely, so I can be in

21   my full faculties when I step into that flight deck and

22   perform my duties.  And, as you stated, for 24 years there

23   is not a blemish on my record.  And I intend to keep it

24   that way.  And that's, that's the bottom line really.  It

25   is my medical I own.  American Airlines does not own my

CAPTAIN BAHIG SALIBA    01/06/2022                41

1  compromise your medical, that you can reach out to your

2  chief pilot and get some guidance on next steps?

3      A.    I already stated that it is my opinion that does

4  all the time, really.  If I am going to go operate an

5  aircraft, it is my opinion, and the FAA gives me full

6  authority over my decision for my medical certificate,

7  concerning my medical certificate, like I said, if

8  American Airlines can show me that they have jurisdiction

9  over my medical certificate, I will comply with everything

10 that American Airlines give me.

11     Q.    Okay.  So --

12     A.    So that's my answer.

13     Q.    -- American --

14     A.    You can take it as yes or no.

15     Q.    American won't provide you with any kind of

16 documentation, other than what the company policy is, that

17 says that American Airlines' policy trumps and overrides

18 FAA policy.  That won't happen.  What you will be provided

19 is what you have been given.

20     A.    Okay.  So --

21     Q.    And if your answer is no, I am not going to

22 comply with company policy moving forward, then, like I

23 said, you are going to WS status.  If your answer is,

24 yeah, I will comply with company policy --

25     A.    Consistent with the flight operations safety

Saliba v. American Airlines, Inc.

# EXHIBIT

## 9

```
 1   right to protect my FAA physical.  That is my decision.
 2           Do you -- would you, let me ask you, Captain
 3   Raynor, would you take anything that jeopardizes your
 4   medical or do anything that jeopardizes your medical so on
 5   your next physical you --
 6       Q.    Absolutely, no, absolutely not.
 7       A.    Okay.  So why --
 8       Q.    This has nothing to do with my medical.
 9       A.    No, no, no.  But my medical is as good as your
10   medical.
11       Q.    How does our mask policy affect your medical?
12       A.    It is my judgment that it does.  So it is my
13   medical and it is my contract with American Airlines.  It
14   started with America West and US Airways and then now
15   American Airlines.  It is my contract.  It is not the
16   JCBA.
17       Q.    So it is your personal contract.  And I hear
18   what you are saying.
19       A.    Right.
20       Q.    But let me emphasize now we start to get into a
21   fitness for duty.  And when we have 14,500 pilots who are
22   wearing the mask per the federal, state, local, and
23   company mandate, who are actually wearing it, and captains
24   who are in the cockpit over the PA asking our passengers
25   to wear it, and a million travelers a day who are wearing
```